No. 2231.

Ex parte J. C. England.

1. Bail—Constitutional Law.—The Bill of Rights, Section 11, of the Constitution, declares that all prisoners are bailable "unless for capital offenses when the proof is evident."
2. Same—Habeas Corpus—Fact Case.—A mistrial because of disagreement of the jury as to a verdict in a trial for a capital offense does not establish *per se* that the proof is not evident, and that the accused is entitled to bail.   But see the statement of the case for evidence in a *habeas corpus* proceeding for bail, under an indictment for murder, *held* not to authorize the refusal of bail.

Habeas Corpus on appeal from the District Court of Eastland.   Tried below before the Hon. J. C. Randolph.

The applicant in this case was held under an indictment which charged him with the murder of W. R. Todd, in Eastland county, Texas, on the first day of July, 1884.   He sued out a writ of *habeas corpus*, after a mistrial upon the said indictment, but upon a hearing of the same he was refused bail, and was remanded to the custody of the sheriff of Eastland county.   His

Statement of the case.

appeal to this court results in the reversal of the order denying bail, and the award of the same in the sum of three thousand five hundred dollars. This report will follow the record in first stating the testimony for the State.

Mrs. Rebecca Hale was the first witness for the State. She testified, in substance, that when the dead body of Todd was found, on or about July 1, 1884, she lived on Colony Fork creek, about three and a half miles from the town of Ranger. She was then acquainted with both the applicant and the deceased. The dead body of the deceased was found on a Thursday night. On the preceding Sunday the applicant was at the witness's house, the avowed purpose of his visit being to see about his recent purchase of three yearlings from witness's husband. In the course of a conversation about a law suit, to which the applicant was a party, and which was to be tried on the next day, the fact that the deceased was to be a witness was adverted to. The applicant said in that connection that if Todd, the deceased, swore on that trial as he had been informed it was his, Todd's, intention to swear, he would never swear against another man. No one was present at the time of this conversation except the applicant, the witness and her three small children. The witness denied that she had ever discussed this case with Doctor Walls, or that she had any ill feeling toward Doctor Walls, or toward the applicant at the time of Todd's death. She was not angry with the applicant for buying the yearlings, but was mad with her husband for selling them. She refused to surrender the yearlings to the applicant, and when he claimed to have bought and paid for them she told him that he did it by getting her husband drunk and "gambling them from him."

Doctor B. F. Walls was not the next, but was the most important, witness for the State, and, as he is frequently referred to by the witnesses who preceded him, his testimony is accorded the next place in this report. He testified that, at about nine o'clock on the night of July 1, 1884, he left the town of Ranger to go to the house of Loyd Sparks. About a mile or a mile and a half from town, the witness's horse threw up his head and showed evident signs of fright. Looking, the witness discovered three persons moving along the railroad track. The witness had ridden forward but a short distance when he heard a curious noise behind him, proceeding evidently from a point near that at which he had but recently seen the three men. Witness dismounted, secured his horse to a tree, and found his way on foot

to the edge of the bank of a cut overlooking the railroad track. Looking from that point to a point near where he last saw the three men, he saw one man lying on the track between the rails, and two men standing over him, one near his head and the other a little back from him.  Witness recognized the two men standing over the prostrate man as the defendant and Dave McGee.  When the witness first looked over the bank, the defendant was in the act of striking the prostrate man, and did strike him two blows that the witness saw.  The instrument with which the blows were struck was about two feet long, but witness could not tell from his distant point of view, what it was. The blows were delivered over the side of the head, and were distinctly heard by the witness.  McGee passed around to the defendant's side after the blows were delivered, and the two engaged for a time in conversation, but in so low a tone that witness could not distinguish what was said.  During this conversation between the defendant and McGee, the witness heard the sound of a pistol cocked or a knife closed with a snap, he could not tell which.  The two men then turned and walked leisurely toward Ranger.  When they got about seventy-five yards off, witness went back to his horse, mounted, and went on to Sparks's.

The witness was afraid that other parties might be engaged in the murder, and might still be in ambush, and, as he had no weapons with him, he decided not to go to the man on the track. Witness remained at Sparks's house until about day break, when he left.  At the crossing of Elm creek he met John Hale, who told him that the cars had run over and killed Todd, and that his body was then lying at the depot.  Witness went to the depot and saw Todd's body.  The distance from which the witness saw the parties at the different stages of the proceedings was measured by Messrs. Wampler and McBride, in the presence of the witness, a few days before this trial.  From the point which the witness occupied when he first saw the three men to the point at which the three men were at that time the distance, by actual measurement, was one hundred and ninety-five feet. From his position on the bank to the point where the blows were struck the distance was eighty-two feet.  Witness was certain that he correctly located the positions occupied by himself, but may have missed the positions of the men a few feet.  When the witness first saw them, the three men were moving together, very slowly, up the railroad track.  The men were not in sight

of witness when he heard the sound described, before he saw them. A cluster of bushes impeded the view. The men were near the entrance of the cut, and rather to the witness's right, when he saw them from the bank. The witness kept his knowledge of the manner of Todd's death so long a secret because he was afraid of being killed by defendant, McGee, or their friends and relatives. On the morning after Todd's death, the witness gave D. W. Woodruff and Joseph Wampler to understand that the railroad did not kill Todd, and that he, witness, saw the killing. He gave that information under the pledge of secrecy, and declined to go before the coroner's jury and testify. Witness thought that about twenty days later he told Caleb Terrell of the manner of Todd's death, and bound him to secrecy, mentioning nobody as the murderers. The several parties to whom witness told the facts advised witness against charging the murderers with the crime at that time. It had always been the witness's purpose to divulge the truth whenever he found it safe to do so. Looking at the prostrate man from the distance of eighty-two feet, it looked to witness like his head was lying on a white bundle or object of some kind.

The witness was in Dallas on private business on the twenty-third day of September, 1886, and made a statement under oath concerning this murder before United States Commissioner Burford. Witness was taken before Burford by Captain Marlow. Witness also made a sworn statement concerning this killing before Judge R. M. Black at the time that the warrants in this case were issued. The witness declined to disclose the nature of his business at Dallas when he was taken, or went before the United States commissioner, further than that it was of a private nature. He had an intimation before then that he might be taken to Dallas, but he was not taken there in custody. On the other hand, he went of his own volition, on private business, and while there was requested by Marlow to make the statement before Burford, and he did so. A man who claimed to be a deputy United States marshal came to the witness in Ranger about July 1, 1886, and asked him what he knew of the killing of Todd. Witness could remember only that he told that man that it was none of his business. The man threatened to iron witness and take him, but did not do so. The further examination of this witness was close and searching, but developed nothing of importance connected with his knowledge of the facts of this case other than has been disclosed above.

B. F. Davis testified, for the State, that on the night of July 1, 1884, Mr. Wampler came to his house and summoned him to serve on the jury of inquest over the dead body of Mr. Todd. Todd's body was reached about thirty minutes after it was passed over by the train. Upon the arrival of the jury the body was examined. No warmth was found about it except in the region of the heart. One leg was found to be broken in two or three places, and an arm in two places. The skull was broken and one side of the head mashed off. The features were very much disfigured, but the remains were readily identified as those of W. R. Todd. But little blood was found in the vicinity of where the body lay, and that was spattered on the rails. It was evident that the body had been dragged over the track for at least twenty steps, the blood splotches and brains showing that fact. A lock of human hair was found on the track, about thirty yards from where the blood splotches were. The blood under the head, at the point where the body was found, was clotted. The defendant served on the jury of inquest. The jury adjourned on that night uncertain, because of the small amount of blood found, as to how Todd came to his death. The body was found at the east end of a long railroad cut, about one and three-fourths miles west of Ranger. A road ran about one hundred yards south of the railroad track at the point where the body was found. The ground at that point was more or less covered with undergrowth. At different points between Ranger and the cut, the brush and undergrowth was thick. Where the railroad track was straight, objects on it could be seen at considerable distances. The witness had no suspicion at the time he served on the jury of inquest that Todd had met his death in any other manner than from natural causes, and that the train had afterwards passed over and mutilated his body. On the evening of Todd's burial, the Rev. Mr. Burr told witness that defendant was suspected of killing deceased and placing his body on the track. Witness heard nothing then about Walls having seen the killing.

G. H. Bohning testified, for the State, that the deceased came to his store in Ranger, about the middle of the afternoon of July 1, 1884, and purchased either a sack of flour or meal. He was then sober and apparently in perfect health.

J. G. Bryant, the next witness for the State, testified that he saw the defendant and the deceased going up the railroad track, in a westerly direction from Ranger, about sundown on the

evening of July 1, 1884. They were then about three hundred yards from the town of Ranger. Deceased had a bag of flour or meal on his shoulder.

The substance of the testimony of A. L. Sparks was that on the first day of July, 1884, he lived with his mother on her place, about three miles distant from Ranger, up the railway. Doctor Walls came to the house of the witness's mother on the night of July 1, 1884, and remained until very early on the next morning. He came and left on horseback. Witness learned of Todd's death on the railroad track on the next morning after it occurred. Witness observed nothing strange or unusual about Doctor Walls's appearance during the night of July 1, 1884. He could not now remember that any member of his mother's family was sick, but Doctor Walls was then their family physician.

Roger Watson was the next witness for the State. He testified to nothing of importance except that he saw defendant and deceased going up the railroad track from Ranger, late on the evening of July 1, 1884. On that same evening, witness went with deceased to the defendant's saloon, and saw the defendant and deceased take a drink together, apparently upon the most friendly terms. While at the bar defendant said something to deceased about a report that he, defendant, had sold deceased whisky on Sunday. He told deceased that he may have given him, but had never sold him, whisky on Sunday. Deceased replied that he and Jack Hale had taken a drink there on Sunday, but that he, deceased, did not pay defendant for it. After this conversation defendant passed a small flask of whisky to deceased, which the deceased placed in his pocket. Deceased then told defendant that he thought it was defendant's treat. Defendant treated, and the deceased, as he left, took up a small sack of meal and started off. Defendant asked deceased if he would not go by and take tea with him. Deceased declined, and he and defendant went off together.

Cross examined, the witness said that afterwards, on the same night, he saw defendant in his saloon. When he, witness, came back to town from supper he saw Doctor Walls on the street. Walls said that he was going home to bed. Later the witness met a man who asked for Doctor Walls. Witness directed the man to the doctor's residence. About thirty minutes later the witness saw two men riding down the railroad track from towards

Doctor Walls's house.   Defendant and deceased appeared to be perfectly friendly when together in the defendant's saloon.

The first witness for the applicant was E. P. Watson.   He was introduced evidently for the purpose of contradicting Doctor Walls, who had denied that he had been furnished a railroad pass to Dallas, though he had been furnished one from Dallas to Ranger.   Mr. Watson, testified, in substance, that on the day after defendant's arrest Walls told him that he traveled to Dallas on a pass furnished him by the railroad, and that he had been for some time in correspondence with a railroad official at Weatherford about this case.   Walls did not mention the name of B. G. Bidwell as the man with whom he had been in correspondence.

O. P. England, the defendant's brother, was next introduced. The purpose of his testimony was evidently to establish an alibi for the defendant.   He located the defendant at his saloon in Ranger from dark on the evening of July 1, 1884, until the report of the deceased's death, by crushing, was brought in by the engineer of the train, after nine o'clock.   He testified, further, that about six weeks prior to the defendant's arrest, he, witness, had a conversation with Doctor B. F. Walls on the streets of Ranger.   Doctor Walls asked witness, in that conversation, if " Tuck" and defendant had not had a serious quarrel.   Witness replied that Tuck may have gotten angry with the defendant. Walls then said that Tuck had "given" defendant away, and advised witness to tell defendant that there was something awful behind, and to advise defendant to get away; that he was accused of killing Todd.   Witness reported the fact to defendant, who "knocked around" Ranger for some time, and then went to his place in Stephens county.   Witness did not know the present whereabouts of McGee.   He left Ranger some time after Todd's death, and had not been seen in the neighborhood since, so far as the witness knew.   The engineer who brought in the report of the killing of a man on the railroad track, described the man who was in the saloon; and the defendant, who, to the witness's knowledge, had been in the saloon since dark, was the first to say that the man described was W. R. Todd.   A number of parties were then in the saloon, but witness could remember none of them by name.   If McGee was in the saloon that night the witness could not remember it.   Todd was described by his clothing, and as a man who had a sack of meal with him.

Mrs. Tucker, the defendant's daughter, testified, in his behalf, that she saw her father when he came home to his supper, early on the evening of Todd's death. She saw him for awhile after supper at home, and did not see him again until morning. The family ate supper a little before or at sun down. When she first saw him he was coming up the railroad from town towards his home. The family lived up the railroad from Ranger about a half mile, or less. Miss Estes was at defendant's house at that time.

Miss Lula Estes testified, for the defendant, that she was at the defendant's house with Mrs. Tucker, on the evening of July 1, 1884, and saw the defendant when he came home to supper, between sun down and dark. She and Mrs. Tucker went into the woods west of the house after supper, and remained out there about an hour. The defendant did not pass them in the woods going west up the railroad during that time. She could not say that it was impossible for him to have passed them without her seeing him. Defendant was gone from the house when Mrs. Tucker and witness returned.

J. M. Davis testified that, on the day after Todd's death, Doctor Walls said to him: "If you can keep a secret, I can tell you one. The railroad did not kill Todd." Walls appeared to make a confidant of witness. The witness knew that Walls caught his horse between sun down and dark on the evening of July 1, 1884, to go to Sparks's house.

J. B. Wampler, constable of the Ranger precinct, testified, for the defendant, that he saw Doctor Walls when he started to Sparks's house on the night of July 1, 1884. He left witness's house about dusk, and went up the railroad, west, towards Sparks's place. Two or three hours later, witness heard of Todd's death. He then summoned a jury to sit on the inquest, and among others the defendant, whom he found in his saloon. The witness described the mangled condition of the remains when viewed by the jury of inquest, as did previous witnesses. He stated further that the moon shone brightly that night and that he could easily see Doctor Walls when he got four hundred steps distant from his house on his way to Sparks's. Witness saw Doctor Walls about 8 o'clock on the next morning, when Walls asked him what the jury's verdict was. Witness told him that it was accidental killing. Walls replied: "Accidental killing, the devil!" and said: "I saw two men at that place who went back to town, and I knew them." Witness then asked Walls to go

with him to the justice to have the jury reassembled. He declined on the ground that if he told what he knew his life would in all probability pay the penalty.

Cross examined, the witness said that he spoke to the justice of the peace, and to others whom he could not recall now, about what Walls told him. He went to Dallas on the same train that took Walls when he made the affidavit against defendant. The witness went for the purpose of securing the appointment of deputy United States marshal, with the view of working up the Todd murder case for the railroad, and took letters of recommendation to the United States marshal to back his application. The witness never saw any correspondence between Walls and any official of the railroad company. He paid his own and Walls's fare to Dallas, and secured return passes for each from General Cabell, the marshal.

From the testimony of several witnesses, not essential to this case to report in full, it appears that the Texas Pacific railway company was interested in fastening the death of Todd upon other causes than by crushing by its cars, inasmuch as the suit of Mrs. M. A. Todd, the widow of the deceased, was then pending in the Federal court at Graham, Texas, for twenty thousand dollars, against the said railroad company, for damages for the killing of the deceased.

Doctor Patterson testified, for the defendant, that he had known the deceased for many years, and had long treated him for a disease of the heart that was liable at any time to prove fatal under the effect of excessive drink or over exercise. He described the general character of the disease in technical terms unnecessary to repeat in this report.

Mr. Gullege testified, for the applicant, that he went to the applicant's house to supper about sundown on the fatal evening. He met Miss Estes and Mrs. Tucker at supper, and returned to the saloon and attended bar until the defendant went home to supper and returned. He then left the saloon to attend to his own business.

*Davenport & Truly*, for the applicant.

*J. H. Burts*, Assistant Attorney General, for the State.

White, Presiding Judge. Applicant was indicted for the murder of W. B. Todd. Upon a trial under said indictment, the

jury having failed to agree, a mistrial was ordered and they were discharged by consent of parties. Applicant then obtained a writ of habeas corpus upon an application for bail, which, having been heard in term time by the Honorable J. C. Randolph, judge of the Thirty-fifth judicial district, he was denied bail and remanded to custody to await another trial. From the judgment he has appealed to this court.

All prisoners are bailable "unless for capital offenses when the *proof is evident.*" (Const., Bill of Rights, sec. 11.) Does a *mistrial* upon the disagreement of the jury as to a verdict in a capital case establish *per se* the fact that the proof is not evident, and that, therefore, the accused is entitled to bail?

Mr. Bishop says: "If there has been a trial before a petit jury failing to agree, and especially if there have been two such trials, that will be a strong fact moving to the granting of bail." (1 Bish. Crim. Proc., 3 ed., sec. 262.) In his valuable work on habeas corpus Mr. Church says: "But the court will not, as matter of course, admit to bail because the jury in a trial for murder have not agreed upon a verdict.  * * *  Where a jury have disagreed twice upon a question of guilt, a doubt may well be raised." (Sec. 408, citing People v. Tinder, 19 Cal., 539; Peo. v. Cole, 6 Park Cr. C., 695; State v. Summons, 19 Ohio, 139; Ex parte Pattison, 56 Miss., 161; People v. Perry, 8 Abb. Pr. R., n. s., 27.)

On the simple fact alone, in this case, that a trial had been had and the jury had failed to agree, we do not think applicant was entitled to bail. But, upon the evidence as exhibited to us in this record, we are of opinion appellant was entitled to bail. This evidence will not be discussed.

The judgment of the court below, refusing bail, is reversed, and applicant will be admitted to bail upon his executing a bond in the sum of thirty-five hundred dollars, with good security, bond conditioned as the law directs; and, upon the execution by him of said bond, the sheriff of Eastland county having him in charge will release him from custody.

The judgment is reversed and bail allowed in the sum of thirty-five hundred dollars.

*Ordered accordingly.*